IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LISA REED and, CINDY DIGIANNANTONIO, on behalf of themselves and all others similarly situated,<br>                Plaintiffs.<br>    v.<br><br>ADVOCATE HEALTH CARE, CHILDREN'S MEMORIAL HOSPITAL, EVANSTON NORTHWESTERN HEALTHCARE, MICHAEL REESE MEDICAL CENTER CORPORATION, DOCTORS COMMUNITY HEALTHCARE CORPORATION, RESURRECTION HEALTH CARE, and UNIVERSITY OF CHICAGO HOSPITALS,<br>                Defendants. | Civil Action No. 06 C 3337<br><br>**JURY TRIAL REQUESTED**<br><br>**JUDGE JOHN F. GRADY** |

**THIRD AMENDED COMPLAINT**

Plaintiffs Lisa Reed and Cindy Digiannantonio, by and through counsel, on behalf of themselves and all others similarly situated, bring this action against defendants for damages, and demand trial by jury, complaining and alleging as follows:

**NATURE OF THE ACTION**

1. Defendants, which own and operate hospitals in the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area as defined by the United States Office of Management and Budget as of December 2005 ("Chicago area"), have for years conspired among themselves and with other hospitals in the Chicago area to depress the

78187.1

compensation levels of registered nurses ("RNs") employed at the conspiring hospitals, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

2. In furtherance of their conspiracy, defendants and their co-conspirators also agreed to regularly exchange detailed and non-public information about the compensation each is paying or will pay to its RN employees. The agreement to exchange such information has facilitated the formation, implementation and enforcement of defendants' wage-fixing conspiracy. Pursuant to this agreement, defendants and their co-conspirators in fact have exchanged such information, through meetings, telephone conversations and written or oral surveys that fall outside the antitrust safety zone identified in the Antitrust Division of the United States Department of Justice's Healthcare Antitrust Guidelines. The exchange of this information itself has suppressed competition among Chicago area hospitals in the compensation of RN employees, and has depressed the compensation they have paid to such employees, in violation of Section 1 of the Sherman Act.

3. Defendants' conspiratorial conduct has occurred in the context of a national nursing shortage. Absent their conspiracy, Chicago area hospitals would have responded to the nursing shortage by, among other things, substantially increasing RN compensation in an effort to attract a sufficient number of RNs to their respective hospitals. The history of hospital RN compensation and vacancy rates in the Chicago area, however, reveals that hospital RNs are not being compensated at competitive levels. Despite years of high vacancy rates, compensation for hospital RNs in the Chicago area has remained low and surprisingly stagnant. The few compensation increases in the past

several years have been far too small to substantially decrease the area's nursing shortage.

4. Plaintiffs, on their own behalf and on behalf of the Class defined below, seek to recover the compensation properly earned by RNs employed at Chicago area hospitals but unlawfully retained by such hospitals as a result of the conspiracy alleged herein. Plaintiffs also seek costs, including reasonable attorneys' fees and interest, as allowed by law.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

6. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c).

## PARTIES

7. Plaintiff Lisa Reed is an RN employed at Advocate South Suburban Hospital, where she has worked for over ten years. She currently resides in Country Club Hills, Illinois.

8. Plaintiff Cindy Digiannantonio is an RN who was employed by Evanston Northwestern Healthcare as an RN from 1991 through September 2005. She currently resides in Highland Park, Illinois.

9. Defendant Advocate Health Care ("Advocate") has its headquarters at 2025 Windsor Drive in Oak Brook, Illinois 60523. According to its website, Advocate "is the largest fully integrated not-for-profit health care delivery system in metropolitan Chicago." <http://www.advocatehealth.com/system/about/overview.html>. It was

created in 1995 through the merger of Evangelical Health Systems Corporation and Lutheran General HealthSystem. According to its 2004 Annual Report, Advocate had $3.57 billion in total assets in 2004. Among the hospitals Advocate operates in the Chicago area are: (a) Advocate Illinois Masonic Medical Center, a 527 bed teaching hospital located in the Lake View community that serves Chicago's north and northwest sides; (b) Advocate Trinity Hospital, a 263 bed facility located on Chicago's southeast side; (c) Advocate Lutheran General Hospital, a 513 bed facility located in Park Ridge, Illinois; (d) Advocate Good Shepard Hospital, a 156 bed facility located in Barrington, Illinois; (e) Advocate Christ Medical Center, a 598 bed facility located in Oak Lawn, Illinois; (f) Advocate South Suburban Hospital, a 291 bed facility located in Hazel Crest, Illinois; (g) Advocate Good Samaritan Hospital, a 302 bed facility located in Barrington, Illinois; and (h) Advocate Bethany Hospital, located in Chicago. *See* <http://www.advocatehealth.com/system/about/news/factsheets.html> . These and other Advocate hospitals are members of the Metropolitan Chicago Healthcare Council ("MCHC").

10. Defendant Children's Memorial Hospital ("CMH") is a 270 bed pediatric hospital located at 2300 Children's Place, Chicago, Illinois 60614-3394. CMH is a member of the MCHC.

11. Defendant Evanston Northwestern Healthcare ("ENH") has its headquarters at 2650 Ridge Avenue, Evanston, Illinois 60201. ENH is an academic health system affiliated with Northwestern University and, according to its 2005 annual report, has $2.47 billion in assets. ENH operates three hospitals in the Chicago area: (a) the 645 bed Evanston Hospital, its flagship operation; (b) Glenbrook Hospital, a 143 bed

facility; and (c) Highland Park Hospital, a 239 bed facility. *See* <http://www.enh.org/aboutus/organization/ >. All three of these hospitals are members of the MCHC.

12. Defendant Michael Reese Medical Center Corporation ("MRMCC") is located at 6730 N. Scottsdale Road, Suite 290, Scottsdale, Arizona 85253. MRMCC operates the Michael Reese Hospital ("MRH"), a 450 bed facility located at 2929 Ellis Avenue, Chicago, Illinois.

13. Doctors Community Healthcare Corporation ("DCHC") is located at 6720 North Scottsdale Road, Suite 275, Scottsdale, Arizona 85253. DCHC operates a number of hospitals across the country, and, on information and belief, is affiliated with MRMCC and the operation of MRH.

14. Defendant Resurrection Health Care ("Resurrection") is a not-for-profit corporation sponsored by the Sisters of the Holy Family of Nazareth and the Sisters of the Resurrection. It is the parent corporation of entities that operate nine hospitals in the Chicago area, including Our Lady of the Resurrection Medical Center (a 291 bed facility in northwestern Chicago), Resurrection Medical Center (a 434 bed facility near O'Hare Airport), St. Joseph Hospital (serving Chicago's north side), Saint Elizabeth Hospital (a 276 bed facility in Chicago), and Saint Mary of Nazareth Hospital Center. *See* <http://www.reshealth.org/locations/default.cfm >. All these hospitals are members of the MCHC.

15. The University of Chicago Hospitals ("UCH") is an academic medical center based in Hyde Park on the campus of the University of Chicago. Its headquarters are located at 5841 S. Maryland Avenue, Chicago, Illinois 60637. UCH is a not-for-profit

corporation that operates Bernard A. Mitchell Hospital (a primary adult patient care facility), the University of Chicago Comer Children's Hospital, and the Chicago Lying-in Hospital (a maternity facility). UCH is, according to its website (<http://www.uchospitals.edu/about/fact/hospitals-sheet.html>), the largest employer on Chicago's south side and earned $869 million in revenues during the 2005 fiscal year. UCH is a member of the MCHC.

## CO-CONSPIRATORS

16. Various other hospitals and individuals not presently named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein. Plaintiffs are not including any federal, state, county or municipal entities among these co-conspirators.

## CLASS ACTION ALLEGATIONS

17. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Class:

> All persons employed by any defendant or co-conspirator to work in a hospital in the Chicago area as an RN at any time from June 20, 2002 until the present.

18. Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of defendants. Plaintiffs believe that at least thousands of RNs have been or are employed by the defendant hospitals and their co-conspirators during the aforementioned Class period. Thus, the Class is so numerous that joinder of all Class members is impracticable.

19. Questions of law and fact that are common to the plaintiffs and other members of the Class predominate over questions that affect only individual members. The questions of law and fact that are common to the Class include:

a. Whether Chicago area hospitals, including those operated by defendants, have conspired to depress the compensation they paid to their RN employees during the Class period;

b. Whether the alleged conspiracy has been effective in depressing RN compensation;

c. Whether Chicago area hospitals, including those operated by defendants, have agreed to share regularly with each other detailed and non-public data about current and prospective RN employee compensation;

d. Whether defendants and the other Chicago area hospitals have regularly exchanged detailed and non-public information about current and future RN employee compensation;

e. Whether the exchange of such information suppressed competition among Chicago area hospitals in the compensation of RN employees, and depressed the compensation paid to such employees; and

f. The formula and data for estimating the amount by which Class members' compensation was depressed.

20. Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs, like all Class members, are RNs who have been employed by one or more of the Chicago hospitals during the Class period and have been damaged by the

unlawful conduct alleged herein. Plaintiffs, by advancing their own claims, will also advance the claims of all members of the Class.

21. Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members. There are no material conflicts between plaintiffs' interests in this litigation and those of Class members that would make class certification inappropriate. Counsel for plaintiffs are experienced in antitrust class actions, and will vigorously assert plaintiffs' claims and those of the other Class members.

22. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the causes of action alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

## **INTERSTATE TRADE AND COMMERCE**

23. Each of the hospitals named as a defendant herein provides patient care for persons coming to that hospital from states other than Illinois.

24. Each defendant named herein compensates the RNs it employs within the Chicago area in part with funds provided by insurance carriers and other health care providers that are located in states other than Illinois. These carriers and providers render payments to each named defendant by mailing funds across state lines.

25. Each defendant named herein also compensates the RNs it employs within the Chicago area in part with Medicare funds paid to each defendant by the United States; these payments to each named defendant are mailed across state lines.

26. The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.

## FACTUAL BACKGROUND

### The Chicago Area Hospital RN Market

27. The Chicago area, as noted above, is comprised of the Chicago-Naperville-Joliet, IL-IN-WI Metropolitan Statistical Area as defined by the United States Office of Management and Budget as of December 2005.

28. Hospitals located in the Chicago area currently employ tens of thousands of full-time equivalent RNs.

### Conspiracy to Suppress RN Compensation

29. Beginning before June of 2002 and continuing to the present, defendants have conspired with each other and with other Chicago area hospitals to depress the compensation paid to RNs employed at hospitals within the Chicago area.

30. In furtherance of their conspiracy, defendants and their co-conspirators have done those things they agreed to do, including:

a. Agreeing to regularly exchange, and regularly exchanging, detailed and non-public data concerning the compensation each is paying or will pay to its RN employees;

b. Agreeing not to compete, and not competing, with each other in the setting of RN employee compensation;

c. Tacitly agreeing not to hire directly RNs employed at other hospitals by offering a higher wage;

d. Paying RN employees at the same or nearly the same rate as each other; and

  e. Jointly recruiting RNs at job fairs and elsewhere to avoid competing to attract new RNs to their respective hospitals.

 31. In particular, during and before the Class period, the actions of defendants and their co-conspirators taken in furtherance of the conspiracy have included the following.

 32. Human resources employees working at defendant and co-conspirator hospitals have regularly telephoned each other to determine the compensation for RNs at competing hospitals, including any scheduled increases in RN compensation contained in operating plans or projected budgets. These information exchanges have increased in frequency and detail at the end of each fiscal year when hospitals draft budgets and decide on RN compensation levels for the following year. Hospital administrators in the Chicago area have used this information to set RN compensation. Human resources employees have been evaluated by their superiors on their ability to accomplish this RN compensation coordination.

 33. Several of the defendants and their co-conspirators conducted informal surveys of other hospitals in order to determine what wages those entities were providing to RNs.

 34. Hospital recruiters and other hospital human resource personnel of the defendants and their co-conspirators met at job fairs and at annual events sponsored by *Nursing Spectrum* magazine and exchanged wage information for RNs in the Chicago area.

 35. Similar types of information were exchanged by representatives of the defendants and their co-conspirators at meetings of various third-party organizations,

including, but not limited to, the Chicago Health Executives Forum, the Human Resources Management Association of Chicago, and the Chicago chapter of the American Society for Healthcare Human Resources Administration.

36. The great majority of hospitals in the Chicago area are members of MCHC. MCHC on its website touts its "human resource services" that include "HRS Surveys [that] provide members with valuable benchmarking data to assist them in developing best practices in the areas of recruiting, retention, compensation and benefits." Among the compensation surveyed is that earned by Chicago area RNs. The resulting data, though ostensibly blinded, readily can be disaggregated on a hospital-by-hospital basis due to other identifying and descriptive information that MCHC provides, such as data on licensed beds and institutional revenue.

37. MCHC conducted meetings for Chicago area hospital recruiters of RNs where compensation was both an agenda item for discussion and the subject of informal discussion.

38. Hospitals in the Chicago area have paid RN compensation within a narrow band of wages.

39. Defendants' unlawful conspiracy has had the following effects, before and during the Class period:

    a. Competition among defendants and their co-conspirators in the recruitment and compensation of hospital RN employees in the Chicago area has been restrained;

    b. Compensation for hospital RN employees in the Chicago area has remained at artificially low levels; and

78187.1

11

    c.   Chicago area hospitals have underutilized RNs, yielding low nurse-to-patient ratios, forcing RNs to work harder for longer hours, and reducing patient quality of care.

40. Defendants' conspiracy to depress RN wages raises a serious healthcare issue. The Antitrust Division of the United States Department of Justice noted in its "Statements of Antitrust Enforcement Policy in Health Care" that "[a] collusive restriction on the compensation paid to health care employees, for example, could adversely affect the availability of health care personnel." Similarly, numerous studies have shown a strong correlation between the numbers of RNs that a hospital employs per patient and the hospital's morbidity and mortality rates. Although defendants and their co-conspirators, like hospitals across the country, complain about the RN shortage, they have not taken the most basic remedial action to alleviate it – they have not offered RNs competitive wages.

### Injury to Plaintiffs and the Class

41. During the Class Period (and before), plaintiffs suffered substantial economic harm in the form of lost compensation as a direct result of defendants' and their co-conspirators' unlawful agreement to depress RN compensation and their unlawful agreement to exchange RN compensation information.

### COUNT I

**CONSPIRACY TO DEPRESS WAGES IN VIOLATION OF
SECTION 1 OF SHERMAN ANTITRUST ACT**

42. Plaintiffs re-allege the allegations in paragraphs 1-40 as if set forth fully herein.

43. Beginning before April 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing conspiracy in restraint of trade to depress the compensation of RNs employed at hospitals in the Chicago area, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

44. Pursuant to this unlawful conspiracy, defendants and their co-conspirators have set the compensation of RNs employed at hospitals in the Chicago area at artificially low levels.

45. As a result of the unlawful conspiracy alleged in this Count, plaintiffs and the other members of the Class have been injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## COUNT II

### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT

46. Plaintiffs re-allege the allegations in paragraphs 1-44 as if set forth fully herein.

47. Beginning before April 2002 and continuing until the present, defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed and non-public information about the compensation being paid or to be paid to their RN employees. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

48. This information-exchange agreement has reduced competition among Chicago area hospitals in the compensation of their RN employees and has depressed the compensation of such employees.

49. The relevant geographic market for the claim alleged in this Count is the Chicago area, and the relevant service market consists of the services provided to hospitals by RN employees.

50. A slight decrease in RN compensation from a competitive level could be imposed collectively by the hospitals in the Chicago area without causing too many RNs to move to any non-conspiring hospitals in the Chicago area, to non-hospital employers within the Chicago area or to employers outside the Chicago area.

51. RNs often are constrained from moving to another geographic area because of region-specific licensing requirements, as well as other professional and familial obligations.

52. Hospital RNs possess unique skill sets and gain industry-specific and employer-specific experience as they work, which renders them more valuable to hospitals than to non-hospital RN employers. As they gain experience, hospitals become the only practical outlets for hospital RNs to sell their services at an amount reflecting their skills and knowledge. Other potential employers, such as doctors' offices, nursing homes and outpatient clinics, offer RNs compensation substantially below that offered by hospitals.

53. Chicago area hospitals expend significant resources accumulating information about compensation paid to RNs at other hospitals in the Chicago area, but not about compensation paid to non-hospital RNs or RNs working outside the Chicago area. Chicago area hospitals rely on this compensation information to set RN compensation levels, reflecting their own understanding that the relevant market involves only hospital RN employees in the Chicago area.

54. Defendants collectively have substantial market power within the relevant market, including the power jointly to set hospital RN employee compensation below competitive levels. This joint power clearly exists because it in fact has been used to pay Class members sub-competitive compensation. Moreover, RNs, like most laborers, generally cannot withhold their services until a later date as a means of negotiating for a higher compensation rate. They depend on a regular income. This weakens their negotiating position with hospitals and enhances the hospitals' market power.

55. The information-exchange agreement has had the effect of suppressing competition among Chicago area hospitals in the compensation of their RNs. The agreement's anticompetitive effect is apparent from the following facts, among others:

a. The information regularly exchanged by Chicago area hospitals pursuant to the agreement has been detailed and non-public information about current and future RN compensation. An agreement to exchange information of this type eliminates a major incentive of hospitals to increase RN compensation. The advantage of raising RN compensation is to attract more and better RN candidates by exceeding the compensation (as estimated from properly available competitive intelligence) paid by competing hospitals. But if a hospital knows that it cannot keep its superior compensation confidential from competitors, it will not offer such compensation in the first place. Without confidentiality, a hospital knows that most or all competing hospitals will match its higher compensation levels. The result is higher labor costs with no competitive advantage. An agreement to regularly exchange detailed and non-public information about current and prospective RN compensation assures that

superior compensation will be timely and specifically known by competitors. Such an agreement, therefore, eliminates the incentive of hospitals to outbid their competitors.

b. Hospitals view RNs, within a few basic categories of experience and specialization, as fungible, permitting hospitals readily to compare and match each other's compensation.

c. The exchange of compensation information increases the relative bargaining power of hospitals in setting RN wages. With such information, hospitals know what others are paying their RN employees, while RN employee applicants, who lack access to most or all of such (non-public) information, know much less about the competitive landscape.

d. The regularity and detail of the information exchanged, the relationships of trust developed among the individuals exchanging the information, and the assurances given that the information would not be used for competitive advantage, encouraged defendants and their co-conspirators to use the information to match and not exceed each other's RN employee compensation levels.

56. For these reasons, the effect of the information-exchange agreement, before and during the Class period, has been to reduce competition among hospitals in the compensation of RN employees and to depress such compensation.

57. As a result of the unlawful agreement alleged herein to exchange RN compensation information, plaintiffs and the other members of the Class have been

injured in their business or property by receiving artificially depressed compensation during and before the Class period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray that:

    A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

    B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

    C.    Plaintiffs and the other members of the Class recover their damages against each defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 15 U.S.C. §15(a);

    D.    Plaintiffs and the other members of the Class, to the greatest extent allowed by law, be awarded post-judgment interest at the highest legal rate from and after the date of service of this Complaint;

    E.    Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

    F.    Plaintiffs and the other members of the Class be granted such other relief deemed proper to this Court.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable in this case.

                                                 Respectfully Submitted,

February 28, 2007                By_____*/s/ Marvin A. Miller*_____

                                                 MARVIN A. MILLER
MATTHEW E. VAN TINE
MILLER LAW LLC
101 North Wacker Drive, Suite 2010
Chicago, IL 60602
Tel: (312) 782-4880
Fax: (312) 782-4485

JOSEPH M. VANEK
SCOTT A. RUKSAKIATI
DAVID P. GERMAINE
VANEK, VICKERS & MASINI, P.C.
225 W. Washington, 18th Floor
Chicago, IL 60606
T: (312) 224-1500
F: (312) 224-1510

DAVID P. DEAN
MARY JOYCE CARLSON
JAMES & HOFFMAN
1101 17th St., NW
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

MICHAEL D. HAUSFELD
DANIEL A. SMALL
JOSEPH M. SELLERS
CHARLES E. TOMPKINS
ALLYSON B. BAKER
COHEN MILSTEIN HAUSFELD
& TOLL, P.L.L.C.
1100 New York Ave., NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

MICHAEL P. LEHMANN
THOMAS P. DOVE
KIMBERLY A. KRALOWEC
FURTH LEHMANN & GRANT LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

DANIEL E. GUSTAFSON
JASON S. KILENE
Gustafson Gluek PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel.: (612) 333-8844
Fax: (612) 339-6622

MARK A. GRIFFIN
RAYMOND J. FARROW
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384

LAWRENCE WALNER
AARON WALNER
LAWRENCE WALNER & ASSOCIATES
150 N. Wacker Drive, Suite 2150
Chicago, Illinois 60606
Tel: (312) 201-1616
FAX: (312) 201-1538

Attorneys for Plaintiffs