**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LISA REED, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )        No. 06 C 3337 |
| | ) |
| ADVOCATE HEALTH CARE, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

After taking the depositions of two employees of defendant Advocate Health Care ("Advocate"), plaintiffs filed a motion to compel those witnesses "to produce documents and answer deposition questions." The two witnesses are Kevin Brady (Advocate's Vice President of Compensation and Benefits) and Richard Dickinson (Advocate's Director of Compensation).

Plaintiffs complain that Advocate's counsel, Michael Shakman, "improperly coached" Messrs. Brady and Dickinson "during the course of the deposition when [Shakman] became afraid that they would not follow their rehearsed scripts" and that counsel for Advocate supplied the witnesses with a copy of a law review article "containing a road map for the defense to win this very case." (Mot. to Compel at 1-3.) Plaintiffs also complain that counsel improperly objected to questions "regarding the fact of the

existence of communications with their counsel" and "regarding materials used during their deposition prep sessions." (<u>Id.</u> at 6.)

Plaintiffs seek an order (1) compelling the witnesses "to respond to questions regarding witness preparation and the law review article"; (2) compelling the witnesses "to produce the documents sought in the subpoenas"; (3) prohibiting speaking objections and instructing Advocate's counsel "to limit his objections to the form of the question"; and (4) granting plaintiffs an additional three hours with each witness.

As counsel for Advocate points out, it does not appear that plaintiffs have fully complied with Rule 37.2's "meet and confer" requirements. Evidently, the parties were attempting to work out some of the issues raised by plaintiffs, particularly with regard to the documents sought in the subpoenas. Plaintiffs filed the instant motion before ascertaining whether there was an actual dispute over the documents and before being able to define the extent of the dispute. (Mot. to Compel, Ex. E.) The parties in this case have a history of filing extensive discovery motions -- piles and piles of paper--without fully complying with Rule 37. It also appears that a great deal of "meeting and conferring" is being conducted via e-mail and letter instead of through the more expeditious means of telephone or face-to-face conversations. The parties are (again) advised to winnow down their discovery disputes *before* seeking the court's intervention and to use more efficient

- 3 -

ways of communicating with each other.  That said, we will consider the merits of plaintiffs' motion, but the parties are forewarned that future discovery motions will be stricken if the court finds that the process contemplated by Rule 37 was not fully or reasonably utilized.

The principal issue raised by the motion, which involves the the intersection of the work-product doctrine[1] and Rule 612 of the Federal Rules of Evidence,[2] is whether plaintiffs are entitled to discover which documents were used by the witnesses during their deposition preparation in order to refresh their memories for the purpose of testifying.  Plaintiffs principally rely on <u>James Julian, Inc. v. Raytheon Co.</u>, 93 F.R.D. 138 (D. Del. 1982), in which the court held that defendants' counsel was entitled to discover a binder of documents used to prepare plaintiff's witnesses for deposition.  Advocate's position is that the documents selected by counsel to prepare the witnesses for their

---

[1] "The purpose of the qualified privilege for attorney work product, which is codified in Federal Rule of Civil Procedure 26(b)(3), is to establish a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny or interference by an adversary." <u>Hobley v. Burge</u>, 433 F.3d 946, 949 (7th Cir. 2006).

[2] Federal Rule of Evidence 612 provides: "[I]f a witness uses a writing to refresh memory for the purpose of testifying, either (1) while testifying, or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness."  "The vast majority of cases that have considered the issue have concluded that Rule 612 is applicable to depositions by virtue of language contained in Federal Rule of Civil Procedure 30(c)."  28 Charles Alan Wright & Victor James Gold, <u>Federal Practice and Procedure</u> § 6183 (1993).

depositions is protected work product and that disclosure is compelled only in the interests of justice. In addition, citing Sporck v. Peil, 759 F.2d 312 (3d Cir. 1985), Advocate contends that plaintiffs first have to elicit testimony on a specific topic and then ask whether the witness reviewed any documents that refreshed his recollection on that area of questioning and influenced his testimony in order to discover the documents selected by Advocate's counsel.

We believe that Raytheon represents the better-reasoned line of cases and is most analogous to the instant case. The Raytheon court held that a binder of documents used for witness preparation constituted work product because the selection and compilation revealed important aspects of counsel's understanding of the case, but that the use of the binder to refresh the witness's memory prior to testifying constituted a waiver of the protection. 93 F.R.D. at 144-146. The court observed:

> Each case must, of course, be evaluated on its own facts. In a given case the fact that the privileged documents contained attorneys' mental impressions might cause the Court to strike the balance in favor of nondisclosure. However, this is not that case. The binder at issue contains various documents selected and arranged by plaintiffs' counsel and given to various witnesses prior to their depositions. Without reviewing those binders defendants' counsel cannot know or inquire into the extent to which the witnesses' testimony has been shaded by counsel's presentation of the factual background. The instant request constitutes neither a fishing expedition into plaintiff's files nor an invasion of counsel's "zone of privacy." Plaintiff's counsel made a decision to educate their witnesses by supplying them with the

binders, and the Raytheon defendants are entitled to know
the content of that education.

Id. at 146.  See also Nicholas J. Murlas Living Trust v. Mobil Oil
Corp., No. 93 C 6956, 1995 WL 124186, at *2-3 (N.D. Ill. Mar. 20,
1995) (holding that documents that witnesses used to refresh their
recollections when preparing for depositions should have been
produced at the time of the depositions).

The reasoning of Raytheon applies here, particularly
considering the large number of documents that Advocate has
produced in this case.  Accordingly, plaintiffs are entitled to
discover which documents Messrs. Brady and Dickinson used to
refresh their recollections when preparing for their depositions
and to have those documents produced (in the event that those
documents have not already been produced to plaintiffs).
Plaintiffs minimize the "refreshing recollection" aspect of the
issue in their briefs, but we emphasize that pursuant to the plain
language of Rule 612, plaintiffs are entitled to discover only
those documents that the witnesses used to refresh their memories
for the purpose of testifying.  Because Advocate did not produce or
inform plaintiffs of all such documents prior to the depositions of
Messrs. Brady and Dickinson, those depositions may be reopened for
the limited purpose of cross-examining the witnesses on the
documents they used to refresh their recollection.  Plaintiffs have
asked for an additional three hours with each witness, but three

hours is unnecessary. Plaintiffs will be limited to one additional hour with each witness.

Plaintiffs' request that the court "compel[] the witnesses to respond to questions regarding witness preparation and the law review article" will be denied because it is far too vague. Such a broad order would not be appropriate because these types of questions implicate the attorney-client privilege. If there are specific questions that were asked at the depositions that drew an instruction from Advocate's counsel not to answer, plaintiffs should have pointed out those specific questions they believe that the deponents should be compelled to answer.

Plaintiffs also ask us to "instruct[] [Advocate's] counsel to limit his objections to the form of the question." We have reviewed the transcripts of the depositions of Messrs. Brady and Dickinson and conclude that Mr. Shakman, Advocate's counsel, conducted himself appropriately and that there is no need to issue any instruction. Mr. Shakman, in fact, exhibited great patience with the conduct of plaintiff's counsel, Thomas Dove. A few examples of Mr. Dove's long-winded, compound, and confusing questions are as follows:[3]

> Q. Show look at 14, you got the wrong document in mind,
> sir, this has nothing to do with going to colleges and
> all of the other silliness that was part of the 100 day

---

[3]   These questions are taken from the unedited rough-draft transcript of Mr. Brady's deposition and the rough-draft transcript of Mr. Dickinson's deposition, which were supplied by the plaintiffs in support of their motion.

program. This was a very specific system wide
communication strategic plan defining the issue of
nurses, position Advocate nurses supported of add broaden
and define the shortage of nurses in the industry, et
cetera. This has nothing to do with this reaching out
and getting, you know, young nurses before they even go
to nursing school. I'm talking about while you were HR
vice-president at Christ here is this program coming out
on Christ letterhead and involving Christ personnel to
do, to create a nation--a draft strategic communication
plan covering Chicago and defeat SEIU by making this an
industry wide problem and look how wonderful Advocate is
responding to it. Where is your response to this to say,
wait a minute, Christ doesn't have this kind of problem,
we have a few units?
(Tr. of Dep. of Kevin Brady at 301.)

Q. What action was taken to address this question of
differentials paid by race even for comparable years of
experience? I mean, this is what this report breaks it
down by hospital and on average across the board. And is
this not a significant concern for you as the vice-
president of compensation and benefits that their [sic]
existed a study which demonstrated at least according to
the study that you've got this various and it seems to be
variably based?
(Id. at 349.)

Q: If something was done on this issue a month before
you took the job and Ms. Trznadl briefed you about two
months, actually a month and a half because you took the
job in March and she briefed you and she has her notes
back from February in 200035 [sic] and the reports, you
know, from Rich Dickinson and, in fact, he compliments
her for compiling all this data, each Excel spread she
will [sic] contains one or more summary pages which you
will want to print, et cetera, then it gets into the
sorted by average rate for the same key jobs and the
sorted by city or suburban and then the analysis of key
jobs paid by race. Okay. It's all just right up the
line. I mean, it's your No. 2 guy who was complimenting
Ms. Trznadl for gathering the data doing a good job. If
something was done by Mr. Diederich, wouldn't you have,
in fact, been apprised of that? In fact, if you look at
the third page of the exhibit, Ms. Dickinson is
complimenting Ms. Trznadl in March after you took the
job?

(<u>Id.</u> at 351.)

Q. The tether is do you know whether or not the surveys themselves were being conducted in compliance with the guidelines as you understand them, whether or not it's a special survey that--excuse me--that Advocate requested or one that they just participated in or that you were aware of because of your being a member of the MCHC Survey Committee, that what was the policy of MCHC, any source of information, do you know whether or not the special cuts had to comply with the Department of Justice Guidelines.
(Tr. of Dep. of Richard Dickinson at 14:40:05-14:40:40.)

Q. You're telling your staff to go out and call the competitors, and, by the way, on the second page here is the names of the people you could call and you can get their phone numbers from Gary Drain at MCHC and basically try to find out what they are doing or plan to do for nurse recruiting and retention and be vague about why you're doing it, and if they really push on it, you can tell me--you can remind them about the fact that you have a refer-a-friend program or paying managers the regular rate of pay for performing in a staff RN capacity. I.e., in order to get information, if they insist, you can give information on the same question. Isn't that what you're saying in this memo?
(<u>Id.</u> at 18:19:21-18:19:59.)

These (and many, many other) inartful questions, dozens of which contained verbatim readings from or unnecessarily lengthy descriptions of particular documents, were a great waste of time. Furthermore, Mr. Dove acted unprofessionally by making several argumentative, hostile, and/or threatening comments, largely to Mr. Shakman but occasionally to the witnesses as well. Mr. Dove's conduct was particularly egregious during Mr. Dickinson's deposition. Here is a sampling:

MR. DOVE: I'll just ask you again. This is center to the case, central to the case. You knew that, right?

You used the surveys and the possible exchange of information in violation of the guidelines?
MR. SHAKMAN:  Object to the form of the question. Multipart question.
MR. DOVE:  No, it's not.  Simple.  Listen, sir.
MR. SHAKMAN:  I'm listening hard.  It's two parts.
MR. DOVE:  If you're listening so hard, you've already missed three or four things today you've had to come back on.
(Tr. of Dep. of Richard Dickinson at 9:41:34-9:41:56.)

. . .

MR. DOVE:  Excuse me.  You're wrong.  The fact of a document request, a discovery request and whether or not it was provided to the witness to produce the documents requested is not protected by the attorney-client privilege, Mr. Shakman.  You're not first year out of law school.  You know better than this.  And I'm going to Judge Grady on this.  This is ludicrous.  You are being obstructionist and you are intentionally trying to establish an objection now about materials that you've spoon fed him I'm certain to this witness as you did to Mr. Brady yesterday, improperly fed to Mr. Brady yesterday and I will bet my bottom dollar you did it again today and you are not happy for the fact that Mr. Brady disclosed it.  So you're trying to set a stage today.  Don't worry, it's all going to the judge.
(Id. at 9:44:46-9:45:26.)

. . .

MR. DOVE [to Mr. Shakman after an objection from Mr. Shakman]:  Gee.  We're going to the judge on this. You're absolutely, completely wrong.  You got caught with your hand in the cookie jar, Mr. Shakman, and you're trying to hide it, okay.  The judge isn't going to like this.  You really blew it.  You should have gotten a cleaned up copy and it shouldn't have been processed through friends in Washington D.C. when it was still in draft.  You told me, oh, Mr. Dove, yesterday on the record, you got it.  How in the hell would you know that I've got it.
(Id. at 9:52:34-9:52:57.)

. . .

MR. DOVE:  [to Mr. Shakman] [Y]our point is absurd. . . [S]top trying to pad the record, Mr. Shakman.  You're ridiculous.
(Id. at 11:18:59-11:19:09.)

. . .

MR. DOVE:  [to the witness] I'm going to tell you Mr. Shakman is wrong and he knows he's wrong and he's playing a game, sir.  I think you had something shoved under your nose to sign . . . .
(Id. at 11:21:43-11:21:51.)

. . .

MR. DOVE:  [Y]ou haven't read it, Mr. Shakman, you just haven't paid any attention to what's going on, and you're delaying the process so at the end of seven hours you can say time has been wasted. . . .
     So all of your objections have been based on the wrong question.  Even though I told you what the question was over and over again, you've wasted my time, you've wasted the court's time, you've wasted the witness's time.
(Id. at 11:28:47-11:28:58, 11:29:25-11:29:35.)

. . .

MR. DOVE:  Mr. Shakman, don't you dare say something to me after what you've done in preparing these witnesses to testify in the fashion that you have and the activities you've engaged in. . . . If you knew the federal rules, apparently you must have at one point but you have seemed to forgotten them . . . .
(Id. at 12:32:54-12:33:37.)

. . .

MR. DOVE:  No, you have no written record, sir, that can demonstrate that you, in fact,[verbally communicated certain guidelines to certain analysts]?
MR. DICKINSON:  I have no--
MR. DOVE:  That you personally told every single analyst back in '95 and every new analyst since that if they got a survey request and it didn't tell them provide only aged data that they could only provide aged data?
MR. SHAKMAN:  I object to the form of the question.

MR. DOVE:  Answer, please.
MR. DICKINSON:   I had told the analysts what the
guidelines were and they understood that.
MR. DOVE:  How do you know they understood that?  Did you
ever check to see if any one of them when presented with
a survey which asks for flash turnaround said it didn't
ask for aged data but I'm going to do it as aged data,
I'm telling you, boss, that I'm doing aged data, and I'm
making a notation on the document that it's aged data?
MR. SHAKMAN:  Let me hear the end of the question so I
can figure out if there is a question there and
determine--
MR. DOVE:  Oh, stop it for heaven's sake.  If you can't
listen, then clean out your ears, okay?
(Id. at 15:17:52-15:18:52.)

. . .

MR. DOVE:  Okay.  We are moving for costs and sanctions
on this and to compel and we're going to be back again
because of the simple fact that you are hiding behind a
blatant disregard for the attorney-client privilege and
it's truly unbelievable.  You can't even look at me, can
you?  I don't blame you.  If I was doing what you were
doing, I'd hide my head in shame as well. . . .
MR. SHAKMAN:  I'd like to repeat my prior comment about
civility.  I think-
MR. DOVE:   Civility, your lack of civility is
overwhelming.  Your mistreatment of the law of the rules,
the Federal Rules of Civil Procedure of discovery is
unbelievable.
MR. DOVE [to the witness]:  Look at the document which
you couldn't remember although you got it late last
night, that you couldn't remember although it's from your
documents, and you couldn't remember although you were
asked over and over again about the guidelines.  Who
prepared this?
(Id. at 17:20:03-17:20:50.)

. . .

MR. SHAKMAN:  I'm done with my objection.
MR. DOVE:  I said disclose.  No, no.  I didn't say--Don't
be cute.  You're not President Clinton.
(Id. at 17:57:16-17:57:19.)

Throughout the deposition, Mr. Dove repeatedly interrupted the witness and Mr. Shakman, even after being asked by Mr. Shakman not to do so. After going well over seven hours and having to be urged a number of times by Mr. Shakman to wrap things up, Mr. Dove closed the deposition with another diatribe, advising Mr. Dickinson that among other things, "You'll see me again." (Id. at 18:31:39-18:31:41.)

Mr. Dove's tone spills into plaintiffs' briefs, which are filled with, as Advocate aptly puts it, overheated rhetoric and unfounded allegations that Advocate's counsel engaged in misconduct. In the court's view, it was Mr. Dove, *plaintiffs'* counsel, not Advocate's counsel, who engaged in misconduct. The above-quoted portions of the depositions speak for themselves. Mr. Dove has demonstrated that he is not an appropriate person to appear for any party at a deposition in this case. Therefore, a different lawyer for plaintiffs must conduct the reopened depositions of Messrs. Brady and Dickinson (if plaintiffs wish to reopen those depositions).

Mr. Dove's conduct persuades us that he either has no concept of the appropriate role of an attorney[4] or that he is unable to conform his behavior to the standards of the profession. In either event, we think the defect could well be structural and

---

[4] It is apparent that Mr. Dove is oblivious to the inappropriate nature of his behavior because it was he, rather than Mr. Shakman, who sought the court's intervention in regard to these depositions.

irremediable.  Thus, a broader question is presented.  The focus of
the parties at this time is on class certification; one of the
showings that a proposed class representative must make is the
adequacy of representation, and the adequacy of counsel is part of
this showing.  In light of these revelations about Mr. Dove's
behavior, his poor judgment, and his lack of the most rudimentary
understanding as to how to question a witness, we do not see how
we could permit him to serve as trial counsel for a plaintiff class
in this case.  Still less could we entrust him with the
responsibility for making the major decisions for plaintiffs (as
appears to be his role to date).  As we now see it, there are two
alternatives: (1) no certification of a class that is represented
by Mr. Dove in any event; or (2) possible certification of a class
that is not represented by Mr. Dove, if certification is otherwise
appropriate.  The court will set a status conference to discuss
this issue when its trial schedule permits it to do so.

### CONCLUSION

Plaintiffs' motion to compel Kevin Brady and Richard Dickinson
to produce documents and answer deposition questions is granted in
part and denied in part.  We hold that plaintiffs are entitled to
discover which documents Messrs. Brady and Dickinson used to
refresh their recollections when preparing for their depositions.
Defendant Advocate is directed to identify those documents to
plaintiffs and to produce the documents if any have not yet been

produced. This should be done by January 25, 2008. Plaintiffs are permitted to reopen the depositions of Messrs. Brady and Dickinson and will be limited to one hour with each witness for the limited purpose of cross-examining the witnesses on the documents they used to refresh their recollection. Mr. Dove shall not question the witnesses or otherwise participate in the depositions. The two depositions shall be completed by February 15, 2008.

The remainder of plaintiffs' requests are denied.


DATE:     January 17, 2008


ENTER:    _____
          John F. Grady, United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LISA REED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 06 C 3337 |
| | ) | |
| ADVOCATE HEALTH CARE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

After taking the depositions of two employees of defendant Advocate Health Care ("Advocate"), plaintiffs filed a motion to compel those witnesses "to produce documents and answer deposition questions."  The two witnesses are Kevin Brady (Advocate's Vice President of Compensation and Benefits) and Richard Dickinson (Advocate's Director of Compensation).

Plaintiffs complain that Advocate's counsel, Michael Shakman, "improperly coached" Messrs. Brady and Dickinson "during the course of the deposition when [Shakman] became afraid that they would not follow their rehearsed scripts" and that counsel for Advocate supplied the witnesses with a copy of a law review article "containing a road map for the defense to win this very case." (Mot. to Compel at 1-3.)  Plaintiffs also complain that counsel improperly objected to questions "regarding the fact of the

existence of communications with their counsel" and "regarding materials used during their deposition prep sessions." (Id. at 6.)

Plaintiffs seek an order (1) compelling the witnesses "to respond to questions regarding witness preparation and the law review article"; (2) compelling the witnesses "to produce the documents sought in the subpoenas"; (3) prohibiting speaking objections and instructing Advocate's counsel "to limit his objections to the form of the question"; and (4) granting plaintiffs an additional three hours with each witness.

As counsel for Advocate points out, it does not appear that plaintiffs have fully complied with Rule 37.2's "meet and confer" requirements. Evidently, the parties were attempting to work out some of the issues raised by plaintiffs, particularly with regard to the documents sought in the subpoenas. Plaintiffs filed the instant motion before ascertaining whether there was an actual dispute over the documents and before being able to define the extent of the dispute. (Mot. to Compel, Ex. E.) The parties in this case have a history of filing extensive discovery motions -- piles and piles of paper--without fully complying with Rule 37. It also appears that a great deal of "meeting and conferring" is being conducted via e-mail and letter instead of through the more expeditious means of telephone or face-to-face conversations. The parties are (again) advised to winnow down their discovery disputes *before* seeking the court's intervention and to use more efficient

ways of communicating with each other.  That said, we will consider the merits of plaintiffs' motion, but the parties are forewarned that future discovery motions will be stricken if the court finds that the process contemplated by Rule 37 was not fully or reasonably utilized.

The principal issue raised by the motion, which involves the the intersection of the work-product doctrine[1] and Rule 612 of the Federal Rules of Evidence,[2] is whether plaintiffs are entitled to discover which documents were used by the witnesses during their deposition preparation in order to refresh their memories for the purpose of testifying.  Plaintiffs principally rely on <u>James Julian, Inc. v. Raytheon Co.</u>, 93 F.R.D. 138 (D. Del. 1982), in which the court held that defendants' counsel was entitled to discover a binder of documents used to prepare plaintiff's witnesses for deposition.  Advocate's position is that the documents selected by counsel to prepare the witnesses for their

---

[1]  "The purpose of the qualified privilege for attorney work product, which is codified in Federal Rule of Civil Procedure 26(b)(3), is to establish a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny or interference by an adversary."  <u>Hobley v. Burge</u>, 433 F.3d 946, 949 (7th Cir. 2006).

[2]  Federal Rule of Evidence 612 provides: "[I]f a witness uses a writing to refresh memory for the purpose of testifying, either (1) while testifying, or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness."  "The vast majority of cases that have considered the issue have concluded that Rule 612 is applicable to depositions by virtue of language contained in Federal Rule of Civil Procedure 30(c)."  28 Charles Alan Wright & Victor James Gold, <u>Federal Practice and Procedure</u> § 6183 (1993).

depositions is protected work product and that disclosure is compelled only in the interests of justice. In addition, citing Sporck v. Peil, 759 F.2d 312 (3d Cir. 1985), Advocate contends that plaintiffs first have to elicit testimony on a specific topic and then ask whether the witness reviewed any documents that refreshed his recollection on that area of questioning and influenced his testimony in order to discover the documents selected by Advocate's counsel.

We believe that Raytheon represents the better-reasoned line of cases and is most analogous to the instant case. The Raytheon court held that a binder of documents used for witness preparation constituted work product because the selection and compilation revealed important aspects of counsel's understanding of the case, but that the use of the binder to refresh the witness's memory prior to testifying constituted a waiver of the protection. 93 F.R.D. at 144-146. The court observed:

> Each case must, of course, be evaluated on its own facts. In a given case the fact that the privileged documents contained attorneys' mental impressions might cause the Court to strike the balance in favor of nondisclosure. However, this is not that case. The binder at issue contains various documents selected and arranged by plaintiffs' counsel and given to various witnesses prior to their depositions. Without reviewing those binders defendants' counsel cannot know or inquire into the extent to which the witnesses' testimony has been shaded by counsel's presentation of the factual background. The instant request constitutes neither a fishing expedition into plaintiff's files nor an invasion of counsel's "zone of privacy." Plaintiff's counsel made a decision to educate their witnesses by supplying them with the

binders, and the Raytheon defendants are entitled to know
the content of that education.

Id. at 146.  See also Nicholas J. Murlas Living Trust v. Mobil Oil
Corp., No. 93 C 6956, 1995 WL 124186, at *2-3 (N.D. Ill. Mar. 20,
1995) (holding that documents that witnesses used to refresh their
recollections when preparing for depositions should have been
produced at the time of the depositions).

The reasoning of Raytheon applies here, particularly
considering the large number of documents that Advocate has
produced in this case.  Accordingly, plaintiffs are entitled to
discover which documents Messrs. Brady and Dickinson used to
refresh their recollections when preparing for their depositions
and to have those documents produced (in the event that those
documents have not already been produced to plaintiffs).
Plaintiffs minimize the "refreshing recollection" aspect of the
issue in their briefs, but we emphasize that pursuant to the plain
language of Rule 612, plaintiffs are entitled to discover only
those documents that the witnesses used to refresh their memories
for the purpose of testifying.  Because Advocate did not produce or
inform plaintiffs of all such documents prior to the depositions of
Messrs. Brady and Dickinson, those depositions may be reopened for
the limited purpose of cross-examining the witnesses on the
documents they used to refresh their recollection.  Plaintiffs have
asked for an additional three hours with each witness, but three

hours is unnecessary.  Plaintiffs will be limited to one additional hour with each witness.

Plaintiffs' request that the court "compel[] the witnesses to respond to questions regarding witness preparation and the law review article" will be denied because it is far too vague.  Such a broad order would not be appropriate because these types of questions implicate the attorney-client privilege.  If there are specific questions that were asked at the depositions that drew an instruction from Advocate's counsel not to answer, plaintiffs should have pointed out those specific questions they believe that the deponents should be compelled to answer.

Plaintiffs also ask us to "instruct[] [Advocate's] counsel to limit his objections to the form of the question."  We have reviewed the transcripts of the depositions of Messrs. Brady and Dickinson and conclude that Mr. Shakman, Advocate's counsel, conducted himself appropriately and that there is no need to issue any instruction.  Mr. Shakman, in fact, exhibited great patience with the conduct of plaintiff's counsel, Thomas Dove.  A few examples of Mr. Dove's long-winded, compound, and confusing questions are as follows:[3]

> Q.  Show look at 14, you got the wrong document in mind, sir, this has nothing to do with going to colleges and all of the other silliness that was part of the 100 day

---

[3]  These questions are taken from the unedited rough-draft transcript of Mr. Brady's deposition and the rough-draft transcript of Mr. Dickinson's deposition, which were supplied by the plaintiffs in support of their motion.

program. This was a very specific system wide
communication strategic plan defining the issue of
nurses, position Advocate nurses supported of add broaden
and define the shortage of nurses in the industry, et
cetera. This has nothing to do with this reaching out
and getting, you know, young nurses before they even go
to nursing school. I'm talking about while you were HR
vice-president at Christ here is this program coming out
on Christ letterhead and involving Christ personnel to
do, to create a nation--a draft strategic communication
plan covering Chicago and defeat SEIU by making this an
industry wide problem and look how wonderful Advocate is
responding to it. Where is your response to this to say,
wait a minute, Christ doesn't have this kind of problem,
we have a few units?
(Tr. of Dep. of Kevin Brady at 301.)

Q. What action was taken to address this question of
differentials paid by race even for comparable years of
experience? I mean, this is what this report breaks it
down by hospital and on average across the board. And is
this not a significant concern for you as the vice-
president of compensation and benefits that their [sic]
existed a study which demonstrated at least according to
the study that you've got this various and it seems to be
variably based?
(Id. at 349.)

Q: If something was done on this issue a month before
you took the job and Ms. Trznadl briefed you about two
months, actually a month and a half because you took the
job in March and she briefed you and she has her notes
back from February in 200035 [sic] and the reports, you
know, from Rich Dickinson and, in fact, he compliments
her for compiling all this data, each Excel spread she
will [sic] contains one or more summary pages which you
will want to print, et cetera, then it gets into the
sorted by average rate for the same key jobs and the
sorted by city or suburban and then the analysis of key
jobs paid by race. Okay. It's all just right up the
line. I mean, it's your No. 2 guy who was complimenting
Ms. Trznadl for gathering the data doing a good job. If
something was done by Mr. Diederich, wouldn't you have,
in fact, been apprised of that? In fact, if you look at
the third page of the exhibit, Ms. Dickinson is
complimenting Ms. Trznadl in March after you took the
job?

(<u>Id.</u> at 351.)

Q.  The tether is do you know whether or not the surveys
themselves were being conducted in compliance with the
guidelines as you understand them, whether or not it's a
special survey that--excuse me--that Advocate requested
or one that they just participated in or that you were
aware of because of your being a member of the MCHC
Survey Committee, that what was the policy of MCHC, any
source of information, do you know whether or not the
special cuts had to comply with the Department of Justice
Guidelines.
(Tr. of Dep. of Richard Dickinson at 14:40:05-14:40:40.)

Q.  You're telling your staff to go out and call the
competitors, and, by the way, on the second page here is
the names of the people you could call and you can get
their phone numbers from Gary Drain at MCHC and basically
try to find out what they are doing or plan to do for
nurse recruiting and retention and be vague about why
you're doing it, and if they really push on it, you can
tell me--you can remind them about the fact that you have
a refer-a-friend program or paying managers the regular
rate of pay for performing in a staff RN capacity.  I.e.,
in order to get information, if they insist, you can give
information on the same question.  Isn't that what you're
saying in this memo?
(<u>Id.</u> at 18:19:21-18:19:59.)

These (and many, many other) inartful questions, dozens of which
contained verbatim readings from or unnecessarily lengthy
descriptions of particular documents, were a great waste of time.
Furthermore, Mr. Dove acted unprofessionally by making several
argumentative, hostile, and/or threatening comments, largely to Mr.
Shakman but occasionally to the witnesses as well.  Mr. Dove's
conduct was particularly egregious during Mr. Dickinson's
deposition.  Here is a sampling:

MR. DOVE:  I'll just ask you again.  This is center to
the case, central to the case.  You knew that, right?

You used the surveys and the possible exchange of information in violation of the guidelines?
MR. SHAKMAN: Object to the form of the question. Multipart question.
MR. DOVE: No, it's not. Simple. Listen, sir.
MR. SHAKMAN: I'm listening hard. It's two parts.
MR. DOVE: If you're listening so hard, you've already missed three or four things today you've had to come back on.
(Tr. of Dep. of Richard Dickinson at 9:41:34-9:41:56.)

. . .

MR. DOVE: Excuse me. You're wrong. The fact of a document request, a discovery request and whether or not it was provided to the witness to produce the documents requested is not protected by the attorney-client privilege, Mr. Shakman. You're not first year out of law school. You know better than this. And I'm going to Judge Grady on this. This is ludicrous. You are being obstructionist and you are intentionally trying to establish an objection now about materials that you've spoon fed him I'm certain to this witness as you did to Mr. Brady yesterday, improperly fed to Mr. Brady yesterday and I will bet my bottom dollar you did it again today and you are not happy for the fact that Mr. Brady disclosed it. So you're trying to set a stage today. Don't worry, it's all going to the judge.
(Id. at 9:44:46-9:45:26.)

. . .

MR. DOVE [to Mr. Shakman after an objection from Mr. Shakman]: Gee. We're going to the judge on this. You're absolutely, completely wrong. You got caught with your hand in the cookie jar, Mr. Shakman, and you're trying to hide it, okay. The judge isn't going to like this. You really blew it. You should have gotten a cleaned up copy and it shouldn't have been processed through friends in Washington D.C. when it was still in draft. You told me, oh, Mr. Dove, yesterday on the record, you got it. How in the hell would you know that I've got it.
(Id. at 9:52:34-9:52:57.)

. . .

MR. DOVE: [to Mr. Shakman] [Y]our point is absurd. . . [S]top trying to pad the record, Mr. Shakman. You're ridiculous.
(<u>Id.</u> at 11:18:59-11:19:09.)

. . .

MR. DOVE: [to the witness] I'm going to tell you Mr. Shakman is wrong and he knows he's wrong and he's playing a game, sir. I think you had something shoved under your nose to sign . . . .
(<u>Id.</u> at 11:21:43-11:21:51.)

. . .

MR. DOVE: [Y]ou haven't read it, Mr. Shakman, you just haven't paid any attention to what's going on, and you're delaying the process so at the end of seven hours you can say time has been wasted. . . .

So all of your objections have been based on the wrong question. Even though I told you what the question was over and over again, you've wasted my time, you've wasted the court's time, you've wasted the witness's time.
(<u>Id.</u> at 11:28:47-11:28:58, 11:29:25-11:29:35.)

. . .

MR. DOVE: Mr. Shakman, don't you dare say something to me after what you've done in preparing these witnesses to testify in the fashion that you have and the activities you've engaged in. . . . If you knew the federal rules, apparently you must have at one point but you have seemed to forgotten them . . . .
(<u>Id.</u> at 12:32:54-12:33:37.)

. . .

MR. DOVE: No, you have no written record, sir, that can demonstrate that you, in fact,[verbally communicated certain guidelines to certain analysts]?
MR. DICKINSON: I have no--
MR. DOVE: That you personally told every single analyst back in '95 and every new analyst since that if they got a survey request and it didn't tell them provide only aged data that they could only provide aged data?
MR. SHAKMAN: I object to the form of the question.

MR. DOVE:  Answer, please.

MR. DICKINSON:   I had told the analysts what the guidelines were and they understood that.

MR. DOVE:  How do you know they understood that?  Did you ever check to see if any one of them when presented with a survey which asks for flash turnaround said it didn't ask for aged data but I'm going to do it as aged data, I'm telling you, boss, that I'm doing aged data, and I'm making a notation on the document that it's aged data?

MR. SHAKMAN:  Let me hear the end of the question so I can figure out if there is a question there and determine--

MR. DOVE:  Oh, stop it for heaven's sake.  If you can't listen, then clean out your ears, okay?

(Id. at 15:17:52-15:18:52.)

. . .

MR. DOVE:  Okay.  We are moving for costs and sanctions on this and to compel and we're going to be back again because of the simple fact that you are hiding behind a blatant disregard for the attorney-client privilege and it's truly unbelievable.  You can't even look at me, can you?  I don't blame you.  If I was doing what you were doing, I'd hide my head in shame as well. . . .

MR. SHAKMAN:  I'd like to repeat my prior comment about civility.  I think-

MR. DOVE:   Civility, your lack of civility is overwhelming.  Your mistreatment of the law of the rules, the Federal Rules of Civil Procedure of discovery is unbelievable.

MR. DOVE [to the witness]:  Look at the document which you couldn't remember although you got it late last night, that you couldn't remember although it's from your documents, and you couldn't remember although you were asked over and over again about the guidelines.  Who prepared this?

(Id. at 17:20:03-17:20:50.)

. . .

MR. SHAKMAN:  I'm done with my objection.

MR. DOVE:  I said disclose.  No, no.  I didn't say--Don't be cute.  You're not President Clinton.

(Id. at 17:57:16-17:57:19.)

Throughout the deposition, Mr. Dove repeatedly interrupted the witness and Mr. Shakman, even after being asked by Mr. Shakman not to do so. After going well over seven hours and having to be urged a number of times by Mr. Shakman to wrap things up, Mr. Dove closed the deposition with another diatribe, advising Mr. Dickinson that among other things, "You'll see me again." (Id. at 18:31:39-18:31:41.)

Mr. Dove's tone spills into plaintiffs' briefs, which are filled with, as Advocate aptly puts it, overheated rhetoric and unfounded allegations that Advocate's counsel engaged in misconduct. In the court's view, it was Mr. Dove, *plaintiffs'* counsel, not Advocate's counsel, who engaged in misconduct. The above-quoted portions of the depositions speak for themselves. Mr. Dove has demonstrated that he is not an appropriate person to appear for any party at a deposition in this case. Therefore, a different lawyer for plaintiffs must conduct the reopened depositions of Messrs. Brady and Dickinson (if plaintiffs wish to reopen those depositions).

Mr. Dove's conduct persuades us that he either has no concept of the appropriate role of an attorney[4] or that he is unable to conform his behavior to the standards of the profession. In either event, we think the defect could well be structural and

---

[4] It is apparent that Mr. Dove is oblivious to the inappropriate nature of his behavior because it was he, rather than Mr. Shakman, who sought the court's intervention in regard to these depositions.

irremediable. Thus, a broader question is presented. The focus of the parties at this time is on class certification; one of the showings that a proposed class representative must make is the adequacy of representation, and the adequacy of counsel is part of this showing. In light of these revelations about Mr. Dove's behavior, his poor judgment, and his lack of the most rudimentary understanding as to how to question a witness, we do not see how we could permit him to serve as trial counsel for a plaintiff class in this case. Still less could we entrust him with the responsibility for making the major decisions for plaintiffs (as appears to be his role to date). As we now see it, there are two alternatives: (1) no certification of a class that is represented by Mr. Dove in any event; or (2) possible certification of a class that is not represented by Mr. Dove, if certification is otherwise appropriate. The court will set a status conference to discuss this issue when its trial schedule permits it to do so.

## **CONCLUSION**

Plaintiffs' motion to compel Kevin Brady and Richard Dickinson to produce documents and answer deposition questions is granted in part and denied in part. We hold that plaintiffs are entitled to discover which documents Messrs. Brady and Dickinson used to refresh their recollections when preparing for their depositions. Defendant Advocate is directed to identify those documents to plaintiffs and to produce the documents if any have not yet been

produced.  This should be done by January 25, 2008.  Plaintiffs are permitted to reopen the depositions of Messrs. Brady and Dickinson and will be limited to one hour with each witness for the limited purpose of cross-examining the witnesses on the documents they used to refresh their recollection.  Mr. Dove shall not question the witnesses or otherwise participate in the depositions.  The two depositions shall be completed by February 15, 2008.

The remainder of plaintiffs' requests are denied.


DATE:    January 17, 2008


ENTER: _____

John F. Grady, United States District Judge